IN THE CIRCUIT COURT IN THE 11TH JUDICIAL CIRCUIT, IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.  12-08569 CA 31

THE STATE OF FLORIDA ex. rel.
ROBERT CUCINOTTA and FORZA LLC,
a Delaware Limited Liability Company,

Petitioners,

v.

CREDIT SUISSE SECURITIES (USA)
LLC, a Delaware Limited Liability
Company,

Respondent.

_____/

## PETITION FOR ENFORCEMENT OF AGENCY ACTION

Pursuant to Fla. Stat. §120.69(1)(c), Petitioners, Robert Cucinotta and Forza LLC, file this Petition for Enforcement of Agency Action against Respondent, Credit Suisse Securities (USA) LLC, and allege as follows:

### NATURE OF THE ACTION

1.     Petitioners are seeking to enforce a Final Order of the Florida Office of Financial Regulation.  The Final Order adopted a Consent Agreement entered into by the Florida Office of Financial Regulation and Credit Suisse Securities (USA) LLC ("Credit Suisse").  A copy of the Final Order and Consent Agreement are attached as Exhibit A.

2.     Pursuant to the Consent Agreement, Credit Suisse is required to offer to repurchase certain auction rate securities that it sold to Individual Investors.  Petitioners believe that they qualify as an Individual Investor under the Consent Agreement. Credit Suisse, however contends that Petitioners do not qualify as an Individual Investor, and has failed to offer to repurchase the Petitioners' auction rate securities.  Accordingly, the Petitioners seek declaratory



EXHIBIT
A

relief to enforce Credit Suisse's repurchase obligations under the Final Order and Consent Agreement.

## PARTIES, JURISDICTION, AND VENUE

3.      Petitioner, Robert Cucinotta is a Florida resident living in Miami-Dade County, and is subject to the jurisdiction of this Court.

4.      Petitioner, Forza, LLC ("Forza") is a Delaware limited liability company, with its principal place of business in Miami-Dade County.  Mr. Cucinotta is the sole member of Forza, and created it as a family investment vehicle.

5.      Respondent, Credit Suisse, is a Delaware limited liability company.  Credit Suisse is a securities dealer registered with the Florida Office of Financial Regulation, has an office in Miami-Dade County, and is subject to the jurisdiction of this Court.

6.      The amount in controversy exceeds $15,000.

7.      Venue is proper in this Court because Credit Suisse's violation of the Consent Agreement occurred in Miami-Dade County.  Thus, the subject matter of the enforcement sought is in Miami-Dade County.

## FACTUAL BACKGROUND

8.      In 2006, Mr. Cucinotta opened an account in the name of Forza at Credit Suisse. Shortly thereafter, Credit Suisse began soliciting Mr. Cucinotta to purchase Student Loan Auction Rate Securities, which are a form of auction rate securities bonds that are issued by student loan agency trusts.

9.      Credit Suisse falsely represented to Mr. Cucinotta that these investments comported with his investment objectives of investing in safe and liquid investments.  In total, Mr. Cucinotta purchased over $105 million of auction rate securities from Credit Suisse.

10.     Auction rate securities ("ARS") are debt investments issued as bonds or preferred stocks. Some ARS products have maturity dates of 20 years or more, and preferred ARS have no maturity date. While ARS are long term investments, they had a feature which historically provided for short-term liquidity. Specifically, the variable interest rates or dividend yields on the ARS were regularly reset through Dutch auctions that occurred every 7, 14, 28, or 35 days. At a Dutch auction, bidders state the number of ARS that they wish to purchase and the minimum interest rate that they are willing to accept. The lowest interest rate required to sell all of the ARS available at auction becomes the rate paid to all holders of that particular ARS until the next auction. If an auction is successful, investors are able to sell their ARS and exit the market on a short term basis. When there are not enough orders to purchase all of the auction rate securities being sold, a "failed" auction occurs and investors are required to hold their ARS until the next successful auction occurs.

11.     Credit Suisse deceptively marketed ARS as cash equivalents and/or short-term risk-free investments. Thus, scores of investors, including Mr. Cucinotta, reasonably believed that investments in ARS were liquid and as secure as cash.

12.     In order to maintain the illusion that ARS were liquid and equivalent to cash, Credit Suisse would manipulate the auction process by submitting support bids for some or all of an ARS issue for which it acted as the sole or lead manager. Support bids were Credit Suisse's proprietary orders that would be filled, in whole or in part, if there was otherwise insufficient demand in an auction. Thus, in order to prevent an auction from failing, Credit Suisse would submit its own bids to purchase an ARS issue.

13.     Because investors could not ascertain how much of an auction was filled through Credit Suisse's support bids, they could not determine if auctions were clearing because of actual

marketplace demand, or because Credit Suisse was manipulating the auction process through support bids.

14.     In the fall of 2007, as the economy began to deteriorate, there was decreasing demand for ARS, and Credit Suisse had to fill the increasing gap between the supply of and the demand for ARS to maintain the illusion that the auction process was functioning.

15.     In February of 2008, Credit Suisse and other firms stopped supporting the Dutch auctions and the entire ARS market collapsed.  As a result, Mr. Cucinotta, who at all times believed that he was buying liquid investments, was stuck with long term securities that he was unable to sell at par value.

16.     The actions of Credit Suisse attracted the attention of regulators who initiated an investigation into the collapse of the ARS market.  Beginning in 2008, Credit Suisse entered into settlement agreements and/or consent decrees with various state regulators to resolve claims by regulators and investors relating to Credit Suisse's marketing and sale of ARS.

17.     On March 1, 2010, Credit Suisse entered into a Consent Agreement with the Florida Office of Financial Regulation.  The Consent Agreement was adopted by a Final Order of the same date. *See* Exhibit A.  Pursuant to the Consent Agreement, Credit Suisse agreed to take the following actions:

> a.     Credit Suisse was obligated to offer to repurchase at par any ARS owned by "Individual Investors." Consent Agreement ¶ III. 8A.
>
> b.     Credit Suisse was obligated to offer to "keep open" the repurchase offer until December 31, 2009. *Id.* at ¶ III. 8C.
>
> c.     Finally, Credit Suisse was obligated to "promptly" provide notice to customers of the repurchase offer. *Id.* at ¶ III. 8D.

18.     The Consent Agreement defines "Individual Investors" to include the following:

> [A]ny natural person who purchased auction rate securities from or
> through a Respondent Credit Suisse account prior to February 14,
> 2008, and also includes
>
> (i)      **legal entities acting as an investment vehicle for
> family members**, including but not limited to IRA accounts,
> Trusts, Family Limited Partnerships, and **other legal entities
> performing a similar function** . . . .

*Id.* at ¶ I. 1(b) (emphasis added).

19.     As defined in the Consent Agreement, Mr. Cucinotta and Forza are an "Individual

Investor." First, all of Mr. Cucinotta's ARS were purchased prior to February 14, 2008. Second,

Mr. Cucinotta formed Forza to act as an investment vehicle for family members. Indeed, Forza

does not own, possess, invest or direct the investment of funds of anyone other than Mr.

Cucinotta and his family. Additionally, Mr. Cucinotta received Credit Suisse account statements

for Forza at his home address, and the e-mail account for Forza is Mr. Cucinotta's personal e-

mail account. Further, Forza is a pass-through entity for tax purposes. Credit Suisse, however,

has taken the position that Forza was an institutional investor and thus, was not subject to the

protections afforded by the Consent Agreement. Accordingly, Credit Suisse has refused to offer

to repurchase the Petitioners' ARS.

20.     All conditions precedent to filing this Petition have been satisfied. In particular,

on October 27, 2011, counsel for Mr. Cucinotta and Forza provided written notice of Credit

Suisse's violation of the Consent Agreement to the Commissioner of the Florida Office of

Financial Regulation, the Florida Attorney General, and Credit Suisse. *See* Letter dated

10/27/2011, attached as Exhibit B. More than 60 days have elapsed since this notice was given.

Accordingly, under Florida Statute §120.69, Mr. Cucinotta and Forza may file this Petition to

enforce Credit Suisse's obligations under the Final Order and Consent Agreement.

21.     Petitioners have retained undersigned counsel to represent it in this action and

have agreed to pay them a reasonable fee for their services.

## COUNT I: DECLARATORY JUDGMENT

22.     Petitioners incorporate by reference the allegations in paragraphs 1 through 21 as though fully set forth herein.

23.     There is a bona fide adverse interest between Petitioners and Credit Suisse concerning the Petitioners' right under the Final Order and Consent Agreement to receive an offer from Credit Suisse to repurchase the Petitioners' ARS at par value.

24.     The Petitioners are uncertain of their rights under the Final Order and Consent Agreement to receive an offer from Credit Suisse to repurchase the Petitioners' ARS at par value; and the Petitioners are entitled to have this uncertainty removed.

**WHEREFORE**, the Petitioners respectfully request that the Court enter a judgment declaring: (1) that the Petitioners are an "Individual Investor" as defined in the Final Order and Consent Agreement and (2) that Credit Suisse is required, pursuant to the Final Order and Consent Agreement, to offer to repurchase Petitioners' ARS at par value.  The Petitioners also request that the Court award Petitioners the reasonable costs and attorneys' fees incurred in litigating this dispute, as well as any other relief the Court deems proper.

Respectfully submitted,

Broad and Cassel
Counsel for Petitioners
One Biscayne Tower, 21st Floor
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone:  305.373.9425
Facsimile:  305.995.6385

By: _____
Mark F. Raymond, P.A.
Florida Bar No. 373397
Michael R. Tolley, Esq.
Florida Bar No. 0027150

4824-7078-2478.1
44379/0001 mrr

6

OFR 2010-104 SS

## STATE OF FLORIDA
## OFFICE OF FINANCIAL REGULATION

IN RE:                                                )
                                                      )
CREDIT SUISSE SECURITIES (USA)                        )          Administrative Proceeding
LLC.                                                  )          No.: 0453-S-9/09
1 Madison Avenue, 9th Floor                           )
New York, New York 10010                              )
                                                      )
                         Respondent.                  )
_____

### FINAL ORDER

The State of Florida, Office of Financial Regulation ("OFFICE"), and Respondent

Credit Suisse Securities (USA) LLC, having entered into the attached Consent

Agreement, last dated _March 1_, 2010, resolving and concluding this matter,

IT IS ACCORDINGLY ORDERED:

1.      The Consent Agreement entered into between the OFFICE and

Respondent, attached hereto, is adopted by the Office and incorporated by reference as if

set forth herein at length.

2.      The OFFICE and Respondent shall comply with all provisions of the

incorporated Consent Agreement.

DONE AND ORDERED this _1ST_ day of _March_, 2010, in Tallahassee,

Leon County, Florida.


J. THOMAS CARDWELL, Commissioner
Office of Financial Regulation


**EXHIBIT**
" A "

## NOTICE OF RIGHT TO JUDICIAL REVIEW

A PARTY WHO IS ADVERSELY AFFECTED BY THE FINAL ORDER IS

ENTITLED TO JUDICIAL REVIEW PURSUANT TO SECTION 120.68, FLORIDA

STATUTES. REVIEW PROCEEDINGS ARE COMMENCED BY FILING THE

ORIGINAL NOTICE OF APPEAL WITH THE AGENCY CLERK FOR THE OFFICE

OF FINANCIAL REGULATION, LEGAL SERVICES OFFICE, SUITE 526,

FLETCHER BUILDING, 200 E. GAINES STREET, TALLAHASSEE, FLORIDA

32399-0379, AND A COPY, ACCOMPANIED BY FILING FEES PRESCRIBED BY

LAW, WITH THE DISTRICT COURT OF APPEAL, FIRST DISTRICT, OR WITH

THE DISTRICT COURT OF APPEAL IN THE APPELLATE DISTRICT WHERE THE

PARTY RESIDES. THE NOTICE OF APPEAL MUST BE FILED WITHIN 30 DAYS

OF RENDITION OF THE ORDER TO BE REVIEWED.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Final Order has been

furnished by regular U.S. Mail to Mr. Andrew J. Geist, Esq., O'Melveny & Myers LLP,

Times Square Tower, 7 Times Square, 34th Floor, New York, New York 10036, this _2nd_

day of _March_ 2010.

Josephine A. Schultz, Esq.
Legal Services Office
Office of Financial Regulation
200 E. Gaines Street
Tallahassee, Florida 32399-0379
(850) 410-9896

Copies furnished to:
Scott Tavolieri, AGC

2

**STATE OF FLORIDA**
**OFFICE OF FINANCIAL REGULATION**

IN RE:                                              )
                                                    )
CREDIT SUISSE SECURITIES (USA)                      )        Administrative Proceeding
LLC.                                                )        No.: 0453-S-9/09
1 Madison Avenue, 9th Floor                         )
New York, New York 10010                            )
                                                    )
                    Respondent.                     )

**CONSENT AGREEMENT**

WHEREAS, at all times relevant herein, the Respondent, CREDIT SUISSE SECURITIES (USA) LLC (hereinafter "Respondent Credit Suisse"), a limited liability company organized under the laws of the state of Delaware, has been and remains a securities dealer registered with the Florida Office of Financial Regulation (hereinafter "the Office") under the provisions of the Florida Securities and Investor Protection Act, Chapter 517, Florida Statutes (hereinafter "the Act"). In addition, Respondent Credit Suisse is a registered securities broker-dealer and an investment adviser covered under federal law offering brokerage and investment products and services to investors across the United States of America; and

WHEREAS, coordinated investigations of the activities of Respondent Credit Suisse and its affiliates in connection with its marketing and sales practices for investment products generally known as "auction rate securities" have been conducted by a multistate task force composed of members of the North American Securities Administrators Association Inc. (hereinafter "NASAA"); and

WHEREAS, Respondent Credit Suisse has cooperated with regulators conducting the investigations by responding to inquiries, providing documentary evidence and other materials, and providing regulators with access to facts relating to the investigations; and

WHEREAS, Respondent Credit Suisse has advised regulators of its agreement to resolve

the investigations relating to its marketing and sales practices to certain investors in auction rate securities; and

WHEREAS, Respondent Credit Suisse admits that this matter is within the subject matter jurisdiction of the Office and that it is personally subject to the jurisdiction of the Office; and

WHEREAS, Respondent Credit Suisse neither admits nor denies the Findings of Fact and Conclusions of Law contained in this Consent Agreement and the Final Order incorporating this Agreement (except as to jurisdiction), and consents to this Agreement and to the entry of a Final Order incorporating this Consent Agreement by the Office, in substantially the form attached hereto as Exhibit A; and

WHEREAS, Respondent Credit Suisse elects to permanently waive any right to a hearing under sections 120.569 and 120.57, Florida Statutes, the making of findings of fact and conclusions of law, and all further proceedings before the Office to which it may be entitled under the Act, or any other law, including any right to appeal, under section 120.68, Florida Statutes, with respect to this Consent Agreement and the Final Order incorporating this Agreement, and all rights to seek judicial review or otherwise challenge the validity of this Consent Agreement and the Final Order incorporating this Agreement.

NOW, THEREFORE, Respondent Credit Suisse and the Office, in consideration of the mutual promises herein, recite, stipulate and agree on the last date executed below as follows:

## I.

## FINDINGS OF FACT

## DEFINITIONS

1.    For the purposes of this Consent Agreement:

(a)    "Auction rate securities" are long-term debt or equity instruments that include auction rate preferred shares of closed-end funds, municipal auction rate bonds, and various asset-

2

1  backed auction rate bonds.  Some auction rate securities products have maturity dates of 20 years

2  or longer; auction rate preferred shares of certain closed-end funds have no maturity date

3  whatsoever.  While auction rate securities are all long-term instruments, one significant feature of

4  auction rate securities, which historically provided the potential for short-term liquidity, is that the

5  variable interest rates reset through a bidding process known as a Dutch auction that occurred in

6  varying increments, generally between seven (7) and forty-two (42) days.  At a Dutch auction,

7  bidders generally state the number of auction rate securities they wish to purchase and the

8  minimum interest rate they are willing to accept.  Bids are then ranked, from lowest to highest,

9  according to the minimum interest rate each bidder is willing to accept.  The lowest interest rate

10  required to sell all of the auction rate securities available at auction, known as the "clearing rate,"

11  becomes the rate paid to all holders of that particular security until the next auction.  If an auction

12  is successful, investors wishing to sell are able to exit the auction rate securities market on a short-

13  term basis.  When there are not enough orders to purchase all of the auction rate securities being

14  sold, a "failed" auction occurs.  If an auction fails, investors are required to hold all or some of

15  their auction rate securities until the next successful auction in order to liquidate their funds, or

16  they may attempt to sell those auction rate securities in a secondary market transaction, if such a

17  secondary market even exists and is functioning.  Beginning in February 2008, the auction rate

18  securities market experienced widespread and repeated failed auctions.

19      (b)   "Individual Investor" means any natural person who purchased auction rate

20  securities from or through a Respondent Credit Suisse account prior to February 14, 2008, and also

21  includes

22         (i)   legal entities acting as an investment vehicle for family members, including

23  but not limited to IRA accounts, Trusts, Family Limited Partnerships, and other legal

24  entities performing a similar function;

3

(ii)   charities and non-profits; and

(iii)   small- to medium-sized businesses with up to $10 million in assets in accounts with Credit Suisse Securities (USA) LLC, any of which purchased auction rate securities from or through Respondent Credit Suisse prior to February 14, 2008. Notwithstanding any other provision, "Individual Investor" does not include broker-dealers, banks, Registered Investment Advisers, other investment firms or investment institutions regardless of whether any of the foregoing were acting for their own account or as conduits for their customers.

(c)   "Institutional Investor" means any other legal entity not meeting the definition of "Individual Investor" in paragraph I.I(b), above, and which purchased auction rate securities from or through a Respondent Credit Suisse account.

(d)   "Proceedings" include, but are not limited to, any meetings, interviews, depositions, hearings, trials, grand jury proceedings, or any other proceedings.

(e)   "The representative specified by NASAA" is the North Carolina Secretary of State as Securities Administrator, or her lawfully authorized designee.

(f)   All other words, terms, and phrases used in this Consent Agreement shall have the usual and ordinary meanings given to them in everyday speech, and are to be taken and understood in their plain, ordinary, and popular sense.

## EVENTS

2.   Respondent Credit Suisse was an underwriter of a limited number of offerings of auction rate securities. Respondent Credit Suisse also acted as a manager for certain issues of auction rate securities. When acting as a sole manager, Respondent Credit Suisse was the only firm that could submit bids into the auction on behalf of its clients and/or other broker-dealers who wanted to buy and/or sell any auction rate securities. When acting as a co-lead manager,

4

Respondent Credit Suisse and the other co-lead managers could directly submit orders into the auction, while other broker-dealers were able to submit orders on behalf of their clients and on their own behalf into the auction through a co-lead manager. Respondent Credit Suisse received revenue in connection with auction rate securities, including underwriting fees representing a percentage of total issuance and a fee for managing the auctions.

3. From time to time over many years, Respondent Credit Suisse submitted support bids, or purchase orders, for some or all of an auction rate security issue for which it acted as the sole or lead manager. Support bids were Respondent Credit Suisse's proprietary orders that would be filled, in whole or in part, if there was otherwise insufficient demand in an auction. When Respondent Credit Suisse purchased auction rate securities through support bids, those auction rate securities were then owned by Respondent Credit Suisse and were recorded on Respondent Credit Suisse's balance sheet.

4. Because investors could not ascertain how much of an auction was filled through proprietary bids of Respondent Credit Suisse and other firms acting as sole or lead managers, they could not determine if auctions were clearing because of normal marketplace demand, or because Respondent Credit Suisse and other firms acting as lead managers were supporting the auctions through their own proprietary purchase orders. Generally, investors also were not aware of the extent to which the auction rate securities market was dependent upon Respondent Credit Suisse's and other broker-dealers' use of support bids for its successful operation. While Respondent Credit Suisse could track its own inventory as a measure of the supply and demand for auction rate securities for which it was a sole, lead, or co-lead manager, ordinary investors had no comparable ability to assess the operation of the market. There was no way for those investors to monitor supply and demand in the market or to assess when broker-dealers might decide to stop supporting the market, which could cause numerous and repeated auction failures.

5

5.    In August 2007, the credit crisis and other deteriorating market conditions strained the auction rate securities market.    Some institutional investors withdrew from the market, decreasing demand for auction rate securities.

6.    The potential for a market dislocation should have been evident to Respondent Credit Suisse.  In those auctions where Respondent Credit Suisse was a lead manager, Respondent Credit Suisse's support bids filled the increasing gap between the supply of and the demand for auction rate securities, maintaining the impression that the auction process was functioning.  From Fall 2007 until February 2008, demand for auction rate securities continued to erode and Respondent Credit Suisse's inventory of auction rate securities grew.  Respondent Credit Suisse was aware of increasing strains on the auction rate securities market and increasingly questioned the viability of the auction rate securities market.  On January 28, 2008, Respondent Credit Suisse provided written disclosure of these increasing risks of owning or purchasing auction rate securities to its customers; prior to that date, certain of its representatives did not fully disclose those increasing risks to certain of their clients.

7.    In February 2008, Respondent Credit Suisse and other broker-dealers stopped supporting the auctions.  Without the benefit of support bids, the auction rate securities market collapsed, leaving investors who thought they were buying liquid, short-term investments instead holding long-term or perpetual securities that they were unable to sell at par value.

8.    In certain instances, Respondent Credit Suisse representatives told certain of the firm's customers that auction rate securities were liquid investments that were alternatives to money market funds as part of a strategy for cash management.  Specifically, certain employees acting on behalf of Respondent Credit Suisse represented to certain investors that auction rate securities were highly liquid, highly rated alternatives to money market investments and other cash-equivalent investments.

6

9.    In the context of the offer and sale of auction rate securities, the failure of certain employees acting on behalf of Respondent Credit Suisse to adequately state complete facts concerning auction rate securities constituted a demonstration of unworthiness to transact the business of a securities dealer, in violation of section 517.161(1)(h), Florida Statutes, and rule 69W-600.013(1)(h)1, Florida Administrative Code, which incorporates FINRA Rule 2010.

10.    The Office received complaints from Florida investors who purchased auction rate securities from Respondent Credit Suisse during the time specified in this Consent Agreement.

11.    Respondent Credit Suisse, by failing reasonably to supervise its registered salesmen under the Act, as described in these Findings of Fact, has violated section 517.161(1)(h), Florida Statutes, and rule 69W-600.013(1)(h)1, which incorporates NASD Conduct Rule 3010.

### ACTION NECESSARY TO PROTECT PUBLIC

12.    Action by the Office to halt further conduct by Respondent Credit Suisse in violation of the Act is necessary and appropriate in the public interest and for the protection of investors, and is consistent with the purposes fairly intended by the policy and provisions of the Act.

13.    The undersigned Respondent Credit Suisse agrees that this Consent Agreement contains, constitutes, and embodies the entire agreement between the undersigned, there being no agreement of any kind, verbal or otherwise, which varies, alters, or adds to this Consent Agreement and the Final Order incorporating this Consent Agreement; and that this Agreement supersedes any prior communication, understanding, or agreement, whether written or oral, concerning the subject matter of this Consent Agreement.

14.    The undersigned Respondent Credit Suisse agrees that the presentation of this Consent Agreement and the Final Order incorporating this Consent Agreement to the Office without the undersigned Respondent Credit Suisse or any counsel for Respondent Credit Suisse

7

1  being present shall not constitute an improper *ex parte* communication between the Office and the

2  Division of Securities or counsel for the Office.

3      15.   Respondent Credit Suisse, by execution of this Consent Agreement, affirmatively

4  states that it has freely agreed to the signing of this Agreement, and that no threats, promises,

5  representations, inducements, or offers of any kind, other than as stated in this document, have

6  been made by the Office or any member of the staff of the Office's Division of Securities, or any

7  agent or employee of the Office in connection with the signing of this Consent Agreement.

8      16.   Based upon the foregoing Findings of Fact, and consistent with the consent of the

9  Respondent Credit Suisse, the Office makes the following:

10

11  II.

12  CONCLUSIONS OF LAW

13      1.   The Office has jurisdiction over the subject matter of securities transactions with

14  persons in Florida and the person of Respondent Credit Suisse under the Act.

15      2.   As described in the Findings of Fact, Respondent Credit Suisse violated section

16  517.161(1)(h), Florida Statutes, and rule 69W-600.013(1)(h)1, which incorporates NASD Conduct

17  Rule 3010 by its failure reasonably to supervise certain of its registered salesmen in their

18  communication of material information concerning auction rate securities.

19      3.   By reason of the matters described in the Findings of Fact, Respondent Credit

20  Suisse through the activities of certain of its registered salesmen demonstrated unworthiness to

21  transact the business of a dealer, in violation of section 517.161(1)(h), Florida Statutes, and rule

22  69W-600.013(1)(h)1, Florida Administrative Code, which incorporates FINRA Rule 2010 by

23  failing to adequately state complete facts concerning auction rate securities.

24

25      4.   Action by the Office against Respondent Credit Suisse pursuant to the cited

26  provisions of the Act is necessary and appropriate in the public interest and for the protection of

8

investors, and is consistent with the purposes fairly intended by the policy and provisions of the Act.

## III.

### RELIEF AND CONSIDERATION

On the basis of the Findings of Fact, Conclusions of Law, and Respondent Credit Suisse's consent to this Agreement, and Respondent Credit Suisse's consent to entry of the Final Order incorporating this Consent Agreement,

IT IS FURTHER AGREED:

1.     The entry of the Final Order incorporating this Consent Agreement terminates the investigation by the Office with respect to Respondent Credit Suisse's marketing and sale of auction rate securities to Individual Investors. However, nothing herein limits the ability of the Office, individually or jointly with other States, in pursuing any investigation with respect to any individual concerning Respondent Credit Suisse's marketing and sale of auction rate securities, whether that individual is associated with Respondent Credit Suisse or otherwise; and specifically excluded from and not covered by this paragraph are any claims by the Office arising from or relating to the Relief and Consideration provisions contained herein.

2.     This Consent Agreement is entered into solely for the purpose of resolving the previously referenced multistate investigation, and is not intended to be used for any other purpose.

3.     Respondent Credit Suisse will CEASE AND DESIST from violating the Florida Securities and Investor Protection Act, Chapter 517, Florida Statutes and will comply with the provisions of that Act.

4.     Respondent Credit Suisse shall make a total payment of FIFTEEN MILLION DOLLARS ($15,000,000.00) to those states and territories that enter administrative or civil consent orders approving the terms of the NASAA settlement and to the State of New York, allocated

.9

according to a formula determined and set by NASAA and the State of New York.

5.     Within ten (10) days following the entry of this Order, Respondent Credit Suisse shall pay the sum of One million, seven hundred eighty-seven thousand, seven hundred dollars and twelve cents ($1,787,700.12) to the State of Florida.   That amount constitutes Florida's allocated share of the total settlement payment described in the preceding paragraph.   Such payment, to be deposited in the Office's Anti-Fraud Trust Fund, shall be submitted in the form of a wire transfer or cashier's check made payable to the "Department of Financial Services."   The fully executed Consent Agreement and payment shall be provided to Scott Tavolieri, Assistant General Counsel, Office of Financial Regulation, 921 N. Davis Street, Building B – Suite 225, Jacksonville, Florida 32209.

6.     In the event another state securities regulator determines not to accept Respondent Credit Suisse's offer of settlement and does not enter an administrative or civil consent order approving the terms of the NASAA settlement, the total amount of the Florida allocated payment shall not be affected, and shall remain at One million, seven hundred eighty-seven thousand, seven hundred dollars and twelve cents ($1,787,700.12).

7.     Respondent Credit Suisse shall not claim, assert, or apply for a tax deduction or tax credit with regard to any state, federal, or local tax for any administrative monetary payment that Respondent Credit Suisse shall pay pursuant to this Consent Agreement.

8.     Respondent Credit Suisse shall fully and fairly comply with all of the following requirements:

A.     As soon as practicable after September 23, 2008, Respondent Credit Suisse will have offered to purchase at par auction rate securities that since February 14, 2008, have not been successfully auctioning from Individual Investors who purchased those auction rate securities from or through a Respondent Credit Suisse account prior to

10

February 14, 2008;

B.    Respondent Credit Suisse shall have purchased such securities from investors who accepted this offer prior to December 11, 2008, by that date;

C.    Respondent Credit Suisse shall keep such offer open until December 31, 2009, and promptly shall purchase such securities from any Individual Investor who accepts the offer between December 11, 2008, and December 31, 2009;

D.    Respondent Credit Suisse promptly will have provided notice to customers of the settlement terms publicly announced on September 16, 2008, and Respondent Credit Suisse promptly will have established a dedicated telephone assistance line, with appropriate staff, to respond to questions from customers concerning the terms of the settlement;

E.    No later than December 11, 2008, any Individual Investor that Respondent Credit Suisse could reasonably identify who sold auction rate securities in a Credit Suisse account below par between February 14, 2008, and September 16, 2008, will have been paid by Respondent Credit Suisse the difference between par and the price at which the Individual Investor sold those auction rate securities;

F.    No later than December 11, 2008, Respondent Credit Suisse shall have notified all Individual Investors that a public arbitrator (as defined by section 12100(u) of the *NASD Code of Arbitration Procedure for Customer Disputes*, effective April 16, 2007), under the auspices of the Financial Industry Regulatory Authority ("FINRA"), will be available for the exclusive purpose of arbitrating any Individual Investor's consequential damages claim. Arbitration shall be conducted by public arbitrators and Respondent Credit Suisse will pay all applicable forum and filing fees. Any Individual Investors who choose to pursue such claims shall bear the burden of proving that they suffered consequential

11

damages and that such damages were caused by investors' inability to access funds consisting of investors' auction rate securities holdings in Credit Suisse accounts. Respondent Credit Suisse shall be able to defend itself against such claims; provided, however, that Respondent Credit Suisse shall not contest in these arbitrations liability related to the sale of auction rate securities; and further provided that Respondent Credit Suisse shall not be able to use as part of its defense an Individual Investor's decision not to borrow money from Respondent Credit Suisse. Punitive damages shall not be available in the arbitration proceedings;

G.    Respondent Credit Suisse shall endeavor to work with issuers and other interested parties, including regulatory and governmental entities, to expeditiously provide liquidity solutions for Institutional Investors;

H.    Beginning December 11, 2008, and then quarterly after that, Respondent Credit Suisse shall submit a written report to the representative specified by NASAA outlining the efforts in which Respondent Credit Suisse has engaged and the results of those efforts with respect to Respondent Credit Suisse's Institutional Investors' holdings in auction rate securities;

I.    Respondent Credit Suisse shall confer with the representative specified by NASAA no less frequently than quarterly to discuss Respondent Credit Suisse's progress to date;

J.    Such quarterly reports shall continue until no later than December 31, 2009;

K.    Following every quarterly report, the representative specified by NASAA will advise Respondent Credit Suisse of any concerns and, in response, Respondent Credit Suisse shall discuss with the representative specified by NASAA how it plans to address such concerns;

12

L.    Respondent Credit Suisse shall make its best efforts to identify Individual Investors who took out loans from Respondent Credit Suisse, between February 14, 2008, and December 11, 2008, that were secured by auction rate securities that were not successfully auctioning at the time the loan was taken out from Respondent Credit Suisse, and who paid interest associated with the auction-rate-securities-based portion of those loans in excess of the total interest and dividends received on the auction rate securities during the duration of the loan.  Respondent Credit Suisse shall reimburse such customers for the excess expense, plus reasonable interest, of the loan.  Such reimbursement shall occur no later than March 31, 2009.  This paragraph does not apply to margin loans;

M.    Respondent Credit Suisse shall, upon request by the Office, provide all documentation and information reasonably necessary for the Office to verify compliance with this Agreement;

N.    Respondent Credit Suisse shall not take any action, or make or permit to be made any public statement, denying, directly or indirectly, any finding in this Consent Agreement or creating the impression that this Agreement is without factual basis.  Nothing in this paragraph affects Respondent Credit Suisse's (a) testimonial obligations; or (b) right to take legal or factual positions in defense of litigation or other legal proceedings to which the Office is not a party; and

O.    Respondent Credit Suisse shall cooperate fully and promptly with the Office and shall use its best efforts to ensure that all of the current and former officers, directors, trustees, agents, members, partners, and employees of Respondent Credit Suisse (and of any of Respondent Credit Suisse's parent companies, subsidiaries, or affiliates) cooperate fully and promptly with the Office in any pending or subsequently initiated investigation, litigation, or other proceeding relating to auction rate securities and/or the subject matter of

this Consent Agreement.  Such cooperation shall include, without limitation, and on a best efforts basis:

      (1)    production, voluntarily and without service of subpoena, upon the request of the Office, of all documents or other tangible evidence requested by the Office and any compilations or summaries of information or data that the Office requests that Respondent Credit Suisse (or Respondent Credit Suisse's parent companies, subsidiaries, or affiliates) prepare, except to the extent such production would require the disclosure of information protected by the attorney-client and/or work product privileges;

      (2)    without the necessity of a subpoena, having the current (and making all reasonable efforts to cause the former) officers, directors, trustees, agents, members, partners, and employees of Respondent Credit Suisse (and of any of Respondent Credit Suisse's parent companies, subsidiaries, or affiliates) attend any proceedings, in Florida or elsewhere, at which the presence of any such persons is requested by the Office, and having such current (and making all reasonable efforts to cause the former) officers, directors, trustees, agents, members, partners, and employees answer any and all inquiries that may be put by the Office to any of them at any proceedings or otherwise, except to the extent such production would require the disclosure of information protected by the attorney-client and/or work product privileges;

      (3)    fully, fairly, and truthfully disclosing all information and producing all records and other evidence in its possession, custody, or control (or the possession, custody, or control of Respondent Credit Suisse's parent companies, subsidiaries, or affiliates) relevant to all inquiries made by the Office concerning the

subject matter of this Consent Agreement, except to the extent such inquiries call for the disclosure of information protected by the attorney-client and/or work product privileges; and

(4)     making outside counsel reasonably available to provide comprehensive presentations concerning any internal investigation relating to all matters in this Consent Agreement and to answer questions, except to the extent such presentations or questions call for the disclosure of information protected by the attorney-client and/or work product privileges.

9.     The cooperation provisions set forth in Paragraph III.8.O, above is not intended, nor is it a reasonable construction of such provisions, to require Respondent Credit Suisse (or any of its parent companies, subsidiaries, or affiliates, or any of their current or former officers, directors, or employees) to violate any foreign or domestic law or regulation in complying with those provisions. Respondent Credit Suisse shall promptly notify the Office if any request under those cooperation provisions have been construed to require that Respondent Credit Suisse (or any of its parent companies, subsidiaries, or affiliates, or any of their current or former officers, directors, or employees) violate any foreign or domestic law or regulation. In such circumstances, the Office shall act in cooperation with Respondent Credit Suisse towards reaching a resolution that would not require a violation of such laws or regulations.

10.     In consideration of Respondent Credit Suisse's agreement to resolve the previously referenced multistate investigation relating to its marketing and sales practices for auction rate securities, and its agreement to fully comply with all the terms of this Consent Agreement, the Office will have refrained from taking legal action against Respondent Credit Suisse with respect to its Institutional Investors until at least December 11, 2008, and will not seek additional monetary payments from Respondent Credit Suisse relating to Respondent Credit

15

Suisse's marketing and sale of auction rate securities.

11.     If payment is not made timely by Respondent Credit Suisse, or if Respondent Credit Suisse defaults in any of its obligations set forth in this Consent Agreement, and notwithstanding any other remedy available under Florida law, the Office may vacate the Final Order incorporating this Consent Agreement, at its sole discretion, upon ten (10) days notice to Respondent Credit Suisse and without opportunity for administrative hearing, or may refer this matter for enforcement as provided in sections 120.69, 517.161, and/or 517.221, Florida Statutes.

12.     Nothing herein shall preclude the State of Florida, its departments, agencies, boards, commissions, authorities, political subdivisions, and corporations (collectively, "State Entities"), other than the Office and then only to the extent set forth in Paragraphs III.1 and III.10, and the officers, agents, or employees of State Entities from asserting any claims, causes of action, or applications for compensatory, nominal and/or punitive damages, administrative, civil, criminal, or injunctive relief against Respondent Credit Suisse in connection with the marketing and sale of auction rate securities by Respondent Credit Suisse.

13.     This Consent Agreement is not intended to indicate that Respondent Credit Suisse or any of its affiliates or current or former employees shall be subject to any disqualifications contained in the federal securities law, the rules and regulations thereunder, the rules and regulations of self regulatory organizations or various states' securities laws including any disqualifications from relying upon the registration exemptions or safe harbor provisions. In addition, this Consent Agreement is not intended to form the basis for any such disqualifications.

14.     For any person or entity not a party to this Consent Agreement, this Agreement does not limit or create any private rights or remedies against Respondent Credit Suisse including, without limitation, the use of any e-mails or other documents of Respondent Credit Suisse or of others for auction rate securities practices, limit or create liability of Respondent Credit Suisse, or

16

limit or create defenses of or for Respondent Credit Suisse to any claims.

15.     This Consent Agreement shall not disqualify Respondent Credit Suisse or any of its affiliates or current or former employees from any business that they otherwise are qualified or licensed to perform under applicable state law and this Consent Agreement is not intended to form the basis for any disqualification.

16.     This Consent Agreement and any dispute related thereto shall be construed and enforced in accordance with, and governed by, the laws of the State of Florida without regard to any choice of law principles.

17.     This Consent Agreement shall be binding upon Respondent Credit Suisse and its affiliates, its successors and assigns as well as the successors and assigns of relevant affiliates, with respect to all conduct subject to the provisions above, and all future obligations, responsibilities, undertakings, commitments, limitations, restrictions, events, and conditions under the above provisions.

18.     This Consent Agreement contains, constitutes, and embodies the entire agreement between the undersigned, there being no agreement of any kind, verbal or otherwise, which varies, alters, or adds to this Consent Agreement; and this Agreement supersedes any prior communication, understanding, or agreement, whether written or oral, concerning the subject matter of this Consent Agreement.

19.     In the event that one or more provisions contained in this Consent Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement.

20.     By its consent to and execution of this Agreement, Respondent Credit Suisse affirmatively represents that it freely agrees to the signing of this Consent Agreement and entry of a Final Order incorporating the Consent Agreement by the Office, and that no threats, promises,

17

representations, inducements, or offers of any kind, other than as stated in this document, have
been made by the Office, any member of the staff of the Office, or any agent or employee of the
Office in connection with the negotiation and signing of this Consent Agreement.

21.     This Consent Agreement shall become final upon entry of the Final Order
incorporating this Consent Agreement.

22.     Credit Suisse Securities (USA) LLC hereby acknowledges that it has been
served with a copy of this Consent Agreement has read this Agreement, is aware of its right to a
hearing and appeal in this matter, and has waived the same.

23.     Credit Suisse admits the jurisdiction of the Office, neither admits nor denies
the Findings of Fact and Conclusions of Law contained in this Agreement, and consents to entry of the
Final Order incorporating this Consent Agreement by the Office

24.     Pierre M. Gentin                                            represents that he/she is the
Managing Director                              of Credit Suisse Securities (USA) LLC and that, as
such, has been authorized by Respondent Credit Suisse to enter into this Consent Agreement for
and on behalf of Credit Suisse Securities (USA) LLC.

WHEREFORE, the undersigned parties hereby acknowledge and agree to the terms and

*[this space intentionally blank]*

18

conditions of the foregoing Consent Agreement by written consent on the last date executed below.

**CREDIT SUISSE SECURITIES (USA) LLC**

By: _____  Title: Managing Director

Print Name: Pierre M. Gentin  Date: 17 February, 2010

STATE OF New York

COUNTY OF New York

SUBSCRIBED AND SWORN TO before me this 17 day of February, 2010.

_____
Notary Public

JOHN J. MacDONALD
Notary Public, State Of New York
No. 01MA8007204
Qualified In New York County
Commission Expires May 18, 20 10

My commission expires: May 18, 2010

Personally known X or produced identification _____
Type of identification produced: _____

**STATE OF FLORIDA**
**OFFICE OF FINANCIAL REGULATION**

By: _____     3/1/10
William F. Reilly, Jr., Co-Interim Director     Date
Division of Securities

19



BROAD AND CASSEL
ATTORNEYS AT LAW

ONE BISCAYNE TOWER
2 SOUTH BISCAYNE BLVD.
21ST FLOOR
MIAMI, FL 33131
TELEPHONE: 305.373.9400
FACSIMILE: 305.373.9443
WWW.BROADANDCASSEL.COM

MARK F. RAYMOND, P.A.
MANAGING PARTNER
DIRECT LINE: 305.373.9425
DIRECT FACSIMILE: 305.995.6385
EMAIL: MRAYMOND@BROADANDCASSEL.COM

October 27, 2011

**VIA FEDEX (850.414.3300)**
Honorable Pam Bondi
Attorney General
The Capital PL-01
Tallahassee, FL 32399-1050

**VIA FEDEX (850.410.9601)**
Honorable Tom Grady
Commissioner
Florida Office of Financial Regulation
200 East Gaines Street
Tallahassee, FL 32399-0370

RE:  **Notice pursuant to Fla. Stat. § 120.69**

Dear General Bondi and Commissioner Grady:

Our firm represents Robert Cucinotta, a Florida resident, and Forza LLC, a Florida limited liability company of which Mr. Cucinotta is the sole member, in seeking repurchase of auction rate securities from Credit Suisse, pursuant to a multi-state settlement agreement and in which the Florida Office of Financial Regulation participated resulting in a Final Order.

The Florida Office of Financial Regulation issued its Final Order dated March 1, 2010, in the administrative proceeding styled In Re Credit Suisse Securities (USA) LLC, Administrative Proceeding No. 0453-S-9/09. This Final Order adopted a Consent Agreement signed on the same date. We enclose copies of these documents.

Under the Final Order and Consent Agreement, Credit Suisse is required to offer to repurchase certain auction rate securities sold to individual investors. *See* Consent Agreement Par. III.8.A-D.

Mr. Cucinotta and Forza LLC have requested Credit Suisse to honor its repurchase obligation under the Final Order and Consent Agreement. Mr. Cucinotta and Forza LLC are an "individual investor" entitled to the benefit of the Final Order and Consent Agreement, under the definition of "individual investor" in the Consent Agreement, Par. I.1.b. Credit Suisse has declined to extend the repurchase offer to Mr. Cucinotta and Forza LLC and is in violation of the Final Order and Consent Agreement. The underlying facts are explained in a previous letter from this firm to James F. McAuley, Esq., Chief Counsel of the Office of Financial Regulation, dated April 12, 2011. A copy of this letter is also enclosed.



EXHIBIT
"B"

Honorable Tom Grady
Honorable Pam Bondi
October 27, 2011
Page 2

    Under the provisions of Fla. Stat. § 120.69, our clients are authorized to proceed with an action in court to enforce Credit Suisse's obligations under the Final Order and Consent Agreement, subject to giving the agency head, the Attorney General, and Credit Suisse prior notice of the violation. This letter will serve as the notice required by the statute. Thank you.

    If you have questions, please contact me.

                                    Sincerely,

                                    Mark F. Raymond /ss

                                    Mark F. Raymond P.A.

Enclosures

cc: Mr. Robert Cucinotta

Office of General Counsel
Florida Office of Financial Regulation
200 East Gaines Street
Tallahassee, FL 32399-0370

Mr. Pierre M. Gentin, Managing Director
Credit Suisse Securities (USA), LLC
1 Madison Avenue, 9th Floor
New York, NY 10019

Andrew Geist, Esq.
O'Melveny and Myers LLP
Times Square Tower
7 Times Square
34th Floor
New York, NY 10036
(Counsel for Credit Suisse)